FISH v. MILLER.

A release obtained from a ward just arrived at age, casts upon the guardian proof of every thing to make it valid, especially a full, entire, and minute account.

A discharge to a guardian is not to be precipitated; there must be time for consultation, a full exposition of the estate and of its administration; and a guardian who has settled his accounts in secret, must prove all this, unless there has been a positive ratification; an intelligent, voluntary acquiescence; or lapse of time sufficient to induce the court to refuse its aid.

The principles upon which a gift by a ward is impeached, apply as strongly to a release precipitately obtained by the guardian.

Although acquiescence by a ward with a guardian's accounts can be inferred from lapse of time, omission to complain, and other circumstances—while confirmation is to be established by evidence; yet they both depend upon a perfect knowledge of rights, facts, and of the ability to procure relief.

THE bill called upon a guardian for an account. The facts are minutely stated in the opinion.

November 21, 22, 29, 30. December 9.

*Mr. Lord*, for the complainant.

*M. Bonney* and *Mr. Foot*, for the defendant.

THE ASSISTANT VICE-CHANCELLOR:—The bill in this cause was filed for the purpose of obtaining an account of monies, received by the defendant on behalf of the complainant, during his minority, and for payment of the amount which may be found due from him; calling for the production of books, vouchers, &c., and also seeking that a certain instrument of release, executed by the complainant, might be cancelled or declared void. The bill waived an answer upon oath.

To this bill a plea and answer was put in, setting up the release in bar of discovery and relief. Upon argument of the plea it was held defective, and ordered to stand for an answer, chiefly because the answer was considered as setting up a full accounting, which of itself constituted a

perfect and distinct defence, while the plea constituted another equally perfect, if unimpeached. There was, therefore, a double defence, which was not admissible. And again,—the plea did not contain averments, that the recital of the release, viz., that the defendant had fully accounted, was true. This fact was not put in issue, but only the fact whether the release contained the recital.

I may here remark, that I do not understand the chancellor as stating that where an answer under oath is waived, any answer put in overrules a plea, as supposed by counsel; but only that an answer of the description of that in the present case, where it presented a good defence to the whole bill, independent of the plea, would have that effect. The settled rule is, that while a plea must deny in general the allegations made to displace the defence it interposes, the answer must meet in detail every specific allegation made with that view. And although, where an oath is waived, the answer is no longer available to the complainant to obtain a discovery, or to the defendant as evidence, yet it seems still requisite to put in issue distinct matters set forth to establish a general charge. (See *Bolton* v. *Gardner*, 3 *Paige*, 277. *Lovett* v. *The Steam Saw-Mill Association*, 6 *Paige*, 58.) Although the defendant has put in his plea and accompanying answer upon oath, yet nothing is more clear than that the court can attach no weight whatever to it on that account; an answer upon oath being waived.

The defendant was the executor of the father of the complainant; he was appointed the general guardian of his person and estate; he acted as guardian *ad litem* in certain partition suits, and in these various capacities he received large sums of money on his account. The proofs in the cause show an amount of about $15,000.

The *first* subject of inquiry is, as to the facts and circumstances cotemporaneous with, and attending the execution of the release, and the legal liabilities and rights of the parties, at that period. *Next*, the testimony as to subsequent admissions and ratifications on the part of the complainant, must be examined. And *lastly*, I shall advert

to the effect of the delay of the party in instituting proceedings.

I. There is no cotemporaneous evidence bearing upon the transaction, except that of Strong, and of Williams, the other subscribing witness. The latter is unimportant in the view now to be taken. There is some testimony respecting an examination of the books by the complainant in Dutchess county and in New-York, but all done prior to his coming of age. I reject this fact as not entitled to the least consideration.

Then excluding, for the present, Strong's testimony, the following case is presented by the defendant himself, upon his own allegations in his pleadings and from his own omissions in his proofs, and upon uncontested facts. He had become the general guardian of the infant, who resided with him for much of his minority. He had received large sums of money on his account. The infant came of age on the 27th of February, 1829. Before that time or between that time and the 25th of March ensuing, the ward and his guardian made some settlement of accounts as the guardian alleges, and on the 25th of March a full and general release is executed. The release was prepared by Mr. Strong. The parties first call upon him either before the 27th of February, or between that time and the 25th of March, to obtain advice as to the mode of settlement. The release was delivered according to the allegation at once, and handed back to be proven, and within ten days afterwards obtained from Strong by the defendant. There is an allegation in the bill that no account was delivered, or made out, prior to this release. The answer denies this statement. There is no testimony of any such account; no evidence of the extent or nature of the statement averred to have been rendered. In my opinion, the legal inference in this case is, that no account was rendered. There is no proof adduced of the exhibition of any vouchers; there was no one to interpose between the guardian and his ward, to examine the statements, and prove the transactions. Within a month after attaining his majority, this release is obtained—after some examina-

1839.
Fish
v.
Miller.

tion of books, made during infancy, and utterly unavailing—upon an application to counsel to prepare a discharge, made probably before the ward was of age, and which, if prompted by his eagerness to get possession of property, it was the guardian's duty to have checked—made without advice, without a full particular account—without room or time given, or if necessary forced upon him, for examination. In my judgment to support a release thus obtained, would be to subvert a most salutary doctrine of the court, and to set at naught some of its most positive decisions.

I have said that the legal inference upon the pleadings and want of evidence on the part of the defendant is, that no account was ever rendered. Counsel urge, however, that the release, having been proved by one of the subscribing witnesses to have been executed, and being found in the hands of the defendant, must be assumed to have been absolutely delivered; and then its recitals are *prima facie* evidence that such an account was rendered. It is obvious that this argument presupposes that the testimony of Strong, as to the conditional delivery, is untrue. He swears that the release was delivered in escrow, to be held until the accounts were submitted and settled, and that the defendant improperly obtained it from him under a promise to return it. But as before observed I am considering the case as if the delivery was absolute, as the defendant avers it was. In my opinion it was wholly inoperative. It effected no discharge of the liability of the defendant. Its recitals establish no facts in his favor, or against the complainant. It was a waste and ineffectual piece of paper.

I take it to be settled, that where a release is obtained upon a ward's freshly arriving of age, the whole burthen is cast upon the guardian of proving every thing essential to make the release a valid discharge; and nothing is more essential, than a full, entire, and minute account.

The doctrine of a court of equity upon this subject, is an instance of the wise flexibility of its rules for the preservation of rights. In a court of law, the moment of

emancipation from legal pupilage is the moment of absolute power and of unlimited capacity. This court extends its watchfulness further, and requires that a discharge to the guardian shall not be precipitated; that ample time shall be allowed for consultation and inquiry; that there shall be a full exhibition of the estate, and of its administration; and it requires that a guardian who settles his account in secret, shall be prepared to prove that he has fully complied with these requisitions, unless he can shelter himself under a positive ratification—a deliberate, intelligent, voluntary acquiescence; or such a flow of time, as will induce the court to refuse its interposition.

That I do not state too strongly the principles of the court, will, I think, appear from the following cases.

First, as to the state of the pleadings. In *Rocke* v. *Morgell*, (2 *Sch. & Lefroy*, 724,) Lord Redesdale held, that where a bill impeached a settled account and release, on the ground that the account was erroneous, that many items were usurious, overcharged, and mistaken, a plea of the release, not averring that the accounts were fair, and not by answer meeting the allegations as to the accounts, was bad. The reason was, that the release was founded on a general settlement of accounts, which was the consideration for it apparent on the face of the instrument. If the consideration was not fair, the release was not a bar.

Again, citing Chief Baron Gilbert, he says,—"Every "release must be founded on some consideration. That "must be either a valuable consideration then given, or "the adjustment of depending accounts. In the latter "case, the fairness of the accounts is of the essence of the "consideration."

The release here is upon its face on the consideration that an account had been settled, and a balance paid. This is alleged by the bill to be untrue. The answer (an oath being waived) is of no moment upon the question. There is no proof of any account. The question then is, supposing the release actually delivered, whether the fact is *prima facie* established by the recitals? Whatever may

1839.
Fish
v.
Miller.

be the rule in ordinary cases, I apprehend that in one of this character, it does not amount to even such evidence.

*Wych* v. *Packington*, (3 *Br. P. C.*, 46.) Sir Cyral Wych and Susan his wife, received the rents and profits of Dame Hester's (an infant) estate as her guardians. In September, 1690, Dame Hester attained her age of 21; on the 4th of November, 1690, and 6th of January, 1691, Sir C. Wych prevailed upon her to sign and allow two separate accounts of his receipts and disbursements touching her estate, on which a considerable balance appeared due to him; but neither of the accounts were perused or examined by any person on behalf of the young lady, nor were any vouchers produced or delivered up to her. In 1697 a new account was rendered by him, he having demanded payment of her of the money alleged to be due. Some errors appearing in it, and there being an important question between them as to a rent charge of £200, she filed her bill for an account of the rents and profits of her estate; but did not complain of or impeach the two settled accounts, supposing they had been waived by the delivery of a fresh account. Sir Cyril plead the accounts in bar, and the plea was allowed. Afterwards a new bill was exhibited for an account, and particularly seeking to be relieved from the two accounts as erroneous. The accounts were again pleaded, and the plea overruled. When the cause was afterwards heard, it was decreed *that the two accounts should be set aside*, and a general account was ordered. There was an important question as to the rent charge, and a re-hearing was obtained, which resulted in the affirmance of the decree, and then an appeal was had to the lords. Upon this appeal, the decree as to the accounts was complained of, as well as upon the other point. Great stress was laid by the appellants upon the lapse of time, and acquiescence in the accounts; of payments made upon the foot of them, and of no objection made.

In the argument for the respondents, it is said that Dame Hester was surprised; that she had just arrived at 21—was ignorant of her own affairs—had no copies nor

1839. Fish v. Miller.

vouchers produced or delivered to her; that she scrupled to sign them, and was persuaded by another; that the accounts themselves consisted only of a few general items of receipts and disbursements, though the matters to be accounted for were eight years' profits of an estate worth £900 per annum; that her acquiescence continued only while she remained ignorant that the accounts were erroneous. The decree was affirmed.

In *Hicks* v. *Hicks*, (3 *Atk.*, 274,) Lord Hardwicke said: "A third excuse made for the receiver, or rather a defence "for him, was, that on the 23d of August, 1743, (the infant "coming of age but two days before,) the receiver settled "accounts with the plaintiff; delivered up his vouchers, gave "him copies of the accounts passed before the master, and "that the plaintiff looked carefully over them, and admitted "the balance to be right, and received it without objection. "This does not weigh with me at all, for most young gen- "tlemen are apt to pass accounts when they come of age "without looking at them, and are tempted to do it in "order to get the balance into their own hands."

In *Revett* v. *Harvey*, (1 *S. & St.* 502,) the bill sought to have a warrant of attorney, and a memorandum of indebtedness given by defendant to the plaintiff, set aside. The plaintiff at the age of 18, was soon to be entitled to considerable estates, but was in pecuniary difficulties. The defendant advanced him, from time to time monies, taking his promissory notes for the amount of each sum, expressing that the cash was advanced to pay for the defendant's board and lodging. He obtained the bond and warrant for £500, before the infant came of age. He continued to advance till February, 1820, when the plaintiff came of age. And he acted as his confidential adviser and solicitor. On the 22d of April, 1820, (about two months after coming of age,) the plaintiff signed this acknowledgment. "Sir, in adjusting our accounts which have this day "been settled at the sum of                I cannot withhold "the expression of my warmest thanks." The bill charged, that when this memorandum was signed, the defendant

1839. Fish v. Miller.

promised to produce the vouchers and settle an account, which was never done; but that the defendant filled up the blank with the sum of £1218 2*s.* 2*d.* being about £800 more than was actually due. The answer stated that the acknowledgment was voluntarily written by the plaintiff on the 22d of April, and left to be copied; that the plaintiff on the ensuing morning examined all the vouchers, and finding the above sum to be the amount, filled up the blank himself; and thereupon all the vouchers were given up to him, except the warrant, which was cancelled and remained in the defendant's possession. There was no testimony taken on the part of the complainant, but witnesses for the defendant deposed, that on comparison, they believed the figures in the acknowledgment were in the plaintiff's hand writing, and not the defendant's.

The Vice-Chancellor said:—The case must be governed by the principles which apply to a guardian and his ward. The defendant thought fit to place himself in a relation with this infant, which gave him great influence over his mind; and he cannot be permitted to conclude the plaintiff by an acknowledgment signed by him within a month after he came of age, and without the intervention of any friend or advisor on his part.

In the important case of *Kilbee* v. *Sneyd*, (2 *Molloy's Rep.* 230,) Lord Chancellor Hart had a similar question before him. It appears that one Adamson had been an executor, and acted as guardian of certain infants, advancing money in gross sums for their maintenance and education, and also to them individually. Advances had been made beyond the portions of the legatees. Adamson relied upon an account settled, and releases procured from the plaintiffs, as they came of age, by which also it was guaranteed, that the advances to any might be charged indiscriminately against all the plaintiffs. "The instrument," Lord Chancellor Hart said, "was open to argument. If it was spontaneous and deliberate, between "parties competent to bind themselves, and duly apprized "of their rights, then all parties signing the instrument

"were answerable for all advances to any one of them; "and beyond that, the instrument must be considered to "liquidate the account, and the parties cannot be allowed "now to go into any retrospect." Upon an argument afterwards had before him, it was urged that Adamson was *quasi* guardian, and the parties just came of age, and that a court of equity prohibits taking a release by a guardian under such circumstances. Lord Chancellor:—"Lord "Alvanley carried that principle so far, that he would not "allow the person become adult to pass, just at 21, a re-"ceiver's accounts, and to consent to vacate his recog-"nizance. He used to say, here is a person all anxiety to "get a few hundred pounds. That anxiety will produce "facility, and it must be restrained. Considering the re-"lation of the parties, if it appears that there was an im-"plicit conformity to the account shown to them, not the "fruit of deliberate investigation by the *cestuis que trust*,—"without vouching or inquiry, I should consider the "agreement and settled account, as so much waste paper."

In *Walker* v. *Symonds*, (3 *Swanston*, 69,) Lord Eldon adverts to the protection which the court extends to infants for a reasonable period after their coming of age, until they had acquired all the information which they might have had if of adult years.

In *Salkeld* v. *Vernon*, (1 *Eden*, 67,) where a release was pleaded in bar of an account, Lord Northington said, "the first question is whether the releases are bars to the "account prayed. And that will depend on the manner "in which they have been obtained. Now a release *ex vi* "*termini* imports a knowledge in the releasor of what he "releases, unless upon a particular and solemn composi-"tion for peace, persons expressly agree to relinquish un-"certain demands. Now here is no evidence of any ac-"count of the personal estate given by the executors, "though the answer alleges there was one, and under-"takes to prove it. I must then take it as a release with-"out an account of what the personal estate was, from the "acting executors."

In the late important case of *Wedderburn* v. *Wedder-*

1839. Fish v. Miller.

*burn*, (2 *Keene's Reports*, 722,) this subject and that of lapse of time was gone into with great labor by Lord Langdale, Master of the Rolls, and his decree was affirmed by Lord Chancellor Cottinham, November, 1838.

Sir James Webster Wedderburn, one of the complainants, attained his age on the 31st of May, 1809. Very minute accounts were thereupon made out and rendered. The accounts related to a share of the plaintiff's father in a partnership concern, the defendants being executors and surviving partners, also for monies expended for maintenance, &c., they filling also the situation of guardians. The great body of the assets was the share in this concern.

It was stated in the answer that such accounts were carefully examined by Sir James and Mr. Murray, his solicitor, and one witness deposed to that effect. On the 16th of September, 1809, a deed was executed between the surviving executor, and Sir James of the second part, reciting that a debt of £9,392, was due to Sir James from the estate of his father; that the balance apparently due him on the accounts, exclusive of such debt, was £11,399; and providing for the payment of the debt by August, 1810, and of the balance of the residuary estate in seven annual instalments. It stated that he, (Sir James,) is now content and satisfied with the disclosure thus far made, and the accounts thus far given by the said J. W. of the personal estate of the said D. W., and of the sum of £9,392, and no more, being justly due from such estate on the account therein mentioned, and of the said principal sum of £11,399 being due to him from such estate under the will of D. W. There was a *proviso* in the deed that the agreement was to be understood as only *applying to the account and state of things on the* 1*st of May*, 1809, and as then accounted for, not as precluding any claim for other monies not yet received, fallen in, or accounted for. These last expressions the Master of the Rolls treats as applying to the uncertain amount of debts which might be recovered.

The Master of the Rolls enters into a very minute ex-

amination of the accounts, and says, (p. 738,) "I think "that this account, which affords no explanation of the "dealings of the surviving partners with the interest of D. "Webster's share in the concern, is not such an account "as the surviving partners, the executors of his will and "guardians of his children, ought to have rendered to the "eldest son, on his coming of age. Every thing ought to "have been clearly and fully explained. Whether a clear "and full account might have been obtained, by searching "through the books, I do not know; but if the fact were "so, I think that was not enough. I think that direct and "clear information of all the transactions, and of his inte- "rest in them ought to have been given to Sir James."

He adds, (741,) "after a most careful consideration of "the accounts and the provisions of the deeds, and having "regard to the relations which subsisted between the par- "ties; I am of opinion that the plaintiff is not precluded "from inquiring into the mode in which the assets of the "old firm had been dealt with by the new, or claiming "any benefit in consequence of such dealing."

It is to be observed, that the foundation of the accounts rendered was a balance sheet struck by the surviving partners on the 1st of May, 1801, being a certain day after the testator's death fixed as the termination of the partnership by the articles. The new firm, the survivors, then assumed all the debts, and took all the assets and property of the old firm, and the survivors had made the valuation and estimate themselves. Upon this subject the defendants proved by witnesses, that they had employed valuers of the property; that the valuation was properly made; and no greater sum could have been obtained at auction. But it was determined that as they held the incompatible situation of surviving partners and purchasers, and of executors of the estate, in fact sellers, and as there was no disinterested person to superintend either the valuation or the transfer, it could not avail. And finally the Master of the Rolls, after stating that the eldest son came of age in May, 1809, and the youngest in 1820, and that no claim was made until 1829, and the bill being filed in 1831,

1839. Fish v. Miller.

says, "in this case, notwithstanding the relation of trus-"tees and *cestuis que trust*, and of guardian and ward—if "complete and satisfactory information had been given—"if I could have been satisfied on examination of all the "documents and evidence, that the children respectively "on their coming of age, had been duly informed of the "real nature and extent of the transactions which the "executors and surviving partners took upon themselves "to arrange between themselves and the estate of their de-"ceased partner and testator, and if the relation of trustee "and *cestuis que trust* had then ceased, I should have "thought time would have been a bar; I should not have "thought it right to open the investigation of transactions "so long treated as closed."

Allusion has been made by counsel to that class of cases in which the court has set aside gifts made to persons holding a confidential situation, before the influence arising from it may be deemed to have ceased. (*Storey's Equity*, vol. 1, 308, 309. *Hatch* v. *Hatch*, 9 *Vesey*, 296.) These cases are placed upon the grounds of public mischief, from the danger of a gross abuse of the relation between the parties. In my opinion, such reasons apply with much greater force to a release precipitately obtained by a guardian, than to a direct gift. In the latter case, the ward knows precisely what he bestows. The bounty is open. In the former, the benefit covertly given is unknown and uncertain. The temptations to the exercise of undue influence are the same; the liability to be influenced is greater where the fact itself of advantage may be concealed, and that concealment may be effected by fictitious, or plausible, yet erroneous accounts.

These authorities render the conclusion, in my opinion, incontestable, that this release, if it had been promptly impeached, would not have been for one moment permitted to stand.

The next inquiry I shall enter upon, is, whether the testimony of Mr. Strong is to be credited. Here one observation strikes my mind as unanswerable. If his statement is not true, the defendant entirely neglected his duty,

and the release must fall. If his statement is true, the defendant never complied with the terms of the delivery, and does not even pretend that he so complied. No account is alleged to have been rendered subsequently to the date of the release. Upon the subject of credence to his testimony, there is one fact distinctly sworn to by young Miller, and distinctly contradicted by Strong, which is of a serious character. Miller swears that at an interview at Brooklyn, he thinks in the spring of 1833, Strong, after using much abusive language, said: "If my claim is out-"lawed, I will see if I cannot make Dan Fish's claim law-"ful, you scoundrel." After some other conversation, in which great intemperance of language was used by him, he repeated: "Well, if my claim is outlawed, I will see if "I can't make his lawful."

A question was put to Strong on his cross-examination, whether he had not said to Miller: "so you say my claim "is outlawed. If my claim is outlawed, I will make Dan "Fish's claim lawful. I will see if I cannot make his "claim lawful," or words to that effect. He answers: "he "made use of no such language, by way of threat, to him; "that there was no reason for it, he having expressly agreed "to pay his account. If there is any attempt to prove such "language upon me, by his son's testimony to the conversa-"tion, or any one else, it certainly will be untrue, for I "expressly deny it, either in language or intent." He fixes the conversation with Miller on Langdon's stoop, in Brooklyn. He had before deposed, that at such interview Miller appeared friendly, and promised to pay his account, and said that an offset, plead by his attorney to Strong's suit, had been done without his orders. He thinks the conversation took place after the suit was commenced. The bill was filed on the 3d of May, 1833.

Some criticism might be used, that Strong means only to deny the use of the language with a view to menace. But after all there is a plain unequivocal denial of the use of the language, plainly sworn by another to have been used. As I am unable to reconcile or explain these statements, I am under the necessity of determining whom I

1839. Fish v. Miller.

must believe. And in this particular I cannot hesitate. I find nothing tending to discredit young Miller, except the error as to the place of the burial of the complainant's mother-in-law, which I do not think sufficient. The influence of his relationship must be regarded in weighing his testimony, but cannot induce its rejection. Mr. Strong thus stands expressly contradicted in his statements to this fact; with a character impeached by several who have mixed with him more of late than the many respectable witnesses who have deposed chiefly from an intercourse of ancient date; proven to have indulged to excess in habits of intemperance, and whose naturally angry and resentful character could not but be inflamed by his practices.

Without then saying that his testimony must be discarded and treated as expunged from the cause, I confess I should hesitate much before I could be brought to build a decision, exclusively or mainly upon it. Thus far my conclusions enable me to dispense with it altogether in supporting the complainant's demand, and I shall proceed to inquire into the other points in the cause.

II. The second subject of examination was the proof as to the admissions and confirmation by the complainant of the release and settlement, and the argument from his long acquiescence. Upon this doctrine of confirmation and acquiescence we must distinguish. An express ratification may be proven; an entire acquiescence may be inferred. The latter may arise upon lapse of time, omission to complain, and other circumstances; the former is simply to be established by evidence. But both entirely depend for being effectual, upon the fact that the party had full and perfect knowledge of all his rights, of all the facts of his case, and of his ability to procure relief by application to the courts of justice.

Lord Chancellor Hart thus states the rule, (*Molony* v. *L'Estrange*, 1 *Beatty's Rep.*, 413.) "The case is one "for relief in a court of equity, unless the plaintiff be "stopped by confirmation, or by such delay as would "induce the court to refuse relief on the ground of gross "laches. All acts, to have the effect of confirmation, must

"be purely voluntary, and done with the intent to ratify "that which the party knows he is entitled to disaffirm." In the case before him it was proven that the party had complained of the bargain made, that advantage had been taken of him. "The evidence," says the Chancellor, "shows that he did not intend to confirm, but was igno- "rant of his power to resist. The successive payments "operate therefore nothing in the way of confirmation."

In *Bennet* v. *Colley*, (2 *Mylne & Keene*, 332,) Lord Brougham says: "it can never be maintained that the ac- "quiescence of a party, ignorant of his rights, operates as a "waiver of any claim, or as a confirmation of any thing "against him. Neither can it be seriously contended that "the proof of ignorance, or want of notice, lies in the party "against whom such acquiescence is alleged. Therefore "nothing remains to be considered but the argument that "by the mere lapse of time after the plaintiff attained his "full age he is barred of his remedy." See also, *Randall* v. *Errington*, 10 *Vesey*, 423. *Morse* v. *Royal*, 12 *Vesey*, 353. *Bowes* v. *The East London Water Works*, 3 *Mad. Rep.* 383. *Cockerell* v. *Cholmely*, 1 *Russel & Mylne*, 425. *Earl of Chesterfield* v. *Janson*, 1 *Vesey, Senr.*, 149–158.

Under the guidance of these cases the first question is, what is the evidence of a ratification of what had been done, or of an admission that it had been done properly: the next is, whether it was made with a full apprisal of the party's rights and situation. I treat an admission that a settlement had been made as equivalent to, and the same with a ratification of a settlement. Each depends upon the same principle for its efficacy. Was the acknowledgment or the confirmation made understandingly; after a full acquaintance with every thing he was entitled to know and proper to be known, in order to form a right decision? It would be as absurd to say that the admission of an adult, that he made a settlement with his guardian during infancy, should be of more avail than such a settlement itself.

The first ground for inferring acquiescence is the neglect of the plaintiff to make any complaint of the guardian's

1839. Fish v. Miller.

conduct, and his neglect to institute a suit until instigated by Strong, and irritated by the course adopted by Miller, upon the divorce obtained by the complainant. I do not find that there is any testimony that the complainant was aware of the release being in the defendant's hands, prior to the summer or fall of 1829, when he called on Strong and said it had been recorded. Strong swears positively both on his direct and cross examination, that the complainant at that time and afterwards, repeatedly complained of the delivery of the release; blamed him and averred that no settlement had ever been made by Miller. Now down to 1829, the habits of friendly and family intercourse between the parties continued unbroken, and while it would be singular in a cautious man of business, to allow a release to remain so long in the hands of even a third person, without calling for the settlement on which it was to be delivered, I do not think it an improbable event in the present case, considering the plaintiff's education and connection. Then down to 1829, we have silence merely, with a plausible reason for it. And in and after 1829, we have proof of his complaining of his guardian's conduct.

But all this reasoning depends upon the assumption, that Strong is in these statements, to be credited. Distrusting his evidence, as I have already stated, I am anxious, if possible, to decide the cause, without resorting to it at all; and I shall proceed, therefore, on the supposition that there is no evidence of a complaint until the filing of the bill, and to examine the proof of positive admissions by the plaintiff.

These admissions are to be found in the depositions of Ezra Miller, the son, and of Bailey. Miller states that he had an interview with Fish, which he fixes as in the latter part of 1830, or the beginning of 1831, at Fish's house in Chapel-street; that Fish said Strong tormented him much; that he wished him to say there had been no settlement between witness' father and himself; that he was a foolish old man; and that a settlement had been made, before a word was said to Strong about drawing a release. "After we settled, and before Strong drew the release,

"your father wanted to lay all the papers before Strong, "but I knew it would not answer—he would have worked "at me and cheated me of all I had; that Strong told him "if he would say the release was left in escrow, he would "put it in chancery, and he could gain a thousand dol-"lars; that he would not do so for any sum whatever—"the defendant had been as good to him as a parent."

Upon this evidence it is to be observed, that the acknowledgment of a settlement is of one made during infancy, or possibly in the interim between the 27th of February, and the 25th of March. That if Fish expressed such distrust of Strong, upon his proposition to lay the papers before him, it was very censurable in the defendant, not to propose some other person; and that the warm expression of the plaintiff's gratitude and confidence, is an interpreter of his acquiescence and delay. I cannot give to this admission the slightest weight.

William Bailey deposes to a conversation with the complainant during the same year, (1831,) in the summer; in which he asked him, if he and Miller had dissolved partnership or settled their accounts. He replied that they had. Bailey said, he hoped it was satisfactorily. Fish replied it was so to him; that he had given him, Miller, a discharge; that he was satisfied with Miller's conduct.

Assuming that Bailey is not discredited by the evidence against his character, I apprehend that proof so loose of so vague an admission never was allowed to preclude the assertion of a right to an account. Parol proof of a parol admission is always accepted with great caution in a court of justice. It is probable that Fish in saying he had settled with the defendant, alluded to the settlement before he was of age, spoken of in his conversation with young Miller. The question must still arise what accounts were settled; were they full, minute, explicit accounts, such as a guardian was bound to present, conveying the uttermost information with entire clearness. The admission could as well have been made upon false and surreptitious accounts, as upon the most perfect statements that honesty and accuracy ever supplied. The inquiry is still unan-

1839. Fish v. Miller.

swered, had he sufficient knowledge to make his admissions of any avail?

This testimony brings down the course of admissions in historical order to the date of the funeral of Fish's mother-in-law. Ezra Miller then deposes, that about September, 1831, he was present at an interview between his father and the complainant, after the funeral of the complainant's mother-in-law. Fish demanded certain papers and a book, observing that he had released him from all accountability; that Strong told him he was to have the papers when he gave the release; that he would give another release or any assignment he might wish, and he thought he was entitled to the papers, and nobody else. Miller said he had already given up all the papers which he ought to give. He asked what papers Fish meant. Fish replied, some notes, receipts, Mrs. Van Orden's bill, a bond to Isaac L. Kip, &c.; that they were in a corner closet. Miller told him he might have them. They were taken by Fish and put into his trunk with the book. In another part of his testimony he describes the book, specifies the vouchers, and says it was the book of accounts of the estate of John Fish.

There is no part of the defendant's case so strong in his favor as this evidence. It certainly shows that the complainant knew of there being a book of the estate, and of certain documents relating to it, and where they were kept. It is a reasonable inference that he had before that time looked into them, certainly enough to identify them. Yet it is open to the criticism, that Fish, though satisfied with an account given to him in 1825, and ever since satisfied with it, should for the first time, as it would seem, ask for these documents in 1831; but it is subject to the more important and decisive observation, that of his not having had a regular statement rendered him after his majority; that it is impossible to say whether these documents were all that related to the estate, or this book comprised all the necessary statements, or even that a satisfactory account could have been made up from them jointly. In *Wedderburn* v. *Wedderburn*, the objectionable item appeared on

the very face of the accounts; and the books before the party would have enabled him to examine and explain it.

Now it is a singular fact, in point of date, and one of no little moment from dates, that according to Brower's testimony, Fish began to complain, after he had obtained this book and the papers, supposing he actually took it away; a fact not clearly proven. This admits of two interpretations; one, that he thought he had disarmed the defendant of the means of defence, and then could succeed in an unjust demand upon him; the other, that the possession of these documents, unfolded to him, or guided him to the state of the accounts, and fixed his decision to institute proceedings.

And yet the remark is obvious, and it is powerful. If the defendant had acted wrongfully, what infatuation was it, to place in the hands of the complainant the means of detection and exposure? The answer is, that no judge can, under the evidence as it stands, be satisfied, that all the accounts were fully and truly set forth in the book surrendered. Professing to be full, there may have been great omissions, and those difficult to be detected.

It is true Miller says that the books contained all the accounts of the estate of Fish. This it is impossible he should know so as to swear to positively. The accounts began in 1808, when he was not more than five years of age.

But without expatiating further upon this point, which admits not of certainty, I proceed to the testimony of Brower. His statement is positive and explicit, that in March or April, 1832, he was present at a conversation between Fish and Miller. Fish said,—" You know the " release was left with Strong until we should have a set-" tlement. Miller answered,—I know it was, but that can " make no difference, for there is nothing coming to you. " Fish then said, you have never rendered me any account. " Miller said he knew it, but there was nothing coming to " him; he had paid it all out to pay his father's debts."

I do not see any just ground for refusing belief to this witness. That his marked particularity in small matters,

has been the result of previous inquiry by counsel, and inspection of the premises with counsel, appears probable. I see in this much care in the counsel, not falsehood in the witness. And judging by the test of clearness of answers, fallible indeed on written testimony, I cannot but regard the witness in a favorable light.

There is one other piece of his evidence of some moment, brought out upon the cross-examination. In May or June, 1832, Strong came to Fish's shop. Strong told him he had never given Miller the release to keep, but had merely lent it to him, and Miller had never returned it. Fish stated that Miller said Strong had given it to him, without his asking for it. Fish then observed there had never been a settlement between him and Miller. Now Fish, knowing that the release was in Miller's hands, may well have supposed that it was conclusive ; in the language of Lord Chancellor Hart, "that he could not resist." Strong's statement may have apprized him of his power, and led him to exercise it.

The result of my examination of this branch of the case is, that the evidence of ratification, admission, and acquiescence, is too slight and faint in itself, as well as too strongly opposed by countervailing testimony, to sustain the defendant in his resistance of the claim.

III. Upon the naked question of mere lapse of time, the case is very clear. The court has gone great lengths in allowing bills to be filed against persons in fiduciary situation, after a long period has gone by. In the case before Lord Hart, to which I have already adverted, (*Mollony* v. *L'Estrange*, 1 *Beatty's Rep.* 406,) he says,—"I know no "case in which a bargain made in direct contravention of "the policy of the court, has been allowed to stand, merely "because it has been submitted to for many years. There "are many cases in which relief has been given after "great lapse of time. The cases of *Beaumont* v. *Boultbee*, (5 *Vesey*, 484. 7 *Ibid.* 599.) *Randall* v. *Errington*, "(10 *Vesey*, 423,) and *Wood* v. *Downes*, (18 *Vesey*, 120,) "are marked instances of this kind." A gift to an at-

torney from a client, was in the principle case set aside, after thirty years' acquiescence.

In the case of *Pickering* v. *Lord Stamford,* (2 *Vesey,* p. 582,) Lord Alvenly said in a case of a bill filed thirty-five years after the right accrued—"in all these cases the "question is, whether there are motives of public policy or "private inconvenience to induce the court to say, under "all the circumstances, the suit ought not to be enter-"tained; and if great public inconvenience would arise, "and the state demand would involve the parties in end-"less difficulties in clearing the accounts; difficulties ari-"sing from the negligence of the other party in lying by. "I very much concur with the principle laid down by "Lord Cowper, in *Pooley* v. *Wray,* (1 *P. Wms.* 355.) "If from the plaintiff lying by, it is impossible for the de-"fendant to render the account he seeks for, or it will "subject him to great inconvenience, he must suffer; or "the court will oppose what I think the best ground, "*public inconvenience.*" See also the case of *Wedder-burn* v. *Wedderburn,* before cited.

In *Gregory* v. *Gregory,* (*Cooper's Reports,* 203,) after eighteen years submission, relief against a purchase by a trustee was refused. In *Champion* v. *Rigby,* (1 *Russ. & Mylne,* 539,) a similar decision was made; and in *Bonney* v. *Ridgard,* (1 *Cox's Ca.* 145,) the time was probably as long. The youngest child attained his age in 1764, and the cause was first heard in 1783. When the bill was filed does not distinctly appear.

The Revised Statutes of our state have now settled this question as to all cases in which their provisions will apply; prescribing that a bill upon the ground of a trust, and in the cases not particularly provided for, must be filed within ten years after the cause for filing them shall accrue. (2 *R. S.* 301, § 52.) No question under this statute arises here, as the bill was filed in 1833, and the plaintiff came of age in 1825. It deserves remark that in the late English statute upon limitations of suits in equity, (3 & 4 Wm. IV. c. 22,) it has been deemed proper to provide "that nothing in the act shall interfere with any rule

1839.
Fish
v.
Miller.

"of courts of equity in refusing relief on the ground of "acquiescence, or otherwise, to any person whose right to "bring a suit might not be barred by virtue of that act," (§ 27.)

These grounds of defence to the bill of the complainant being in my mind insufficient, there occurs to me but one difficulty in giving full relief by an unmodified decree for an account, which is this. It is stated as before noticed, by Ezra Miller the son, that after the funeral in 1831, a book of accounts was demanded by Fish and given up to him; that he put it with certain documents, notes, &c., relating to his father's estate, into his trunk. It was the book in which the account was kept respecting the estate. Again at folio 36, he states, that that book contained the whole of the accounts of the estate of John Fish, the father of Daniel. He states also that there were other account books in his father's possession, but whether relating to family accounts, or to this estate, does not appear. And he states also the delivery to Fish of the notes and bond to Kip, before mentioned.

Upon this evidence I remark, that it is not stated by Miller that Fish carried the trunk away with him; and Westervelt states that he and Fish went from Fish's house to the ferry to attend the funeral; came back in the Flushing stage; rode to Fish's house in Chappel-street, and he has no recollection of a trunk being brought back with them. He says also that he lived with Fish at the time spoken of, and never saw him in possession of any books or papers relating to Miller's transactions about his father's estate.

Again, I am not satisfied that the book in question, assuming that Fish obtained and has it now in his custody, was the only book containing the account, or that the withholding it and the documents disables the defendant from stating one. As to the right of possession, I consider that the defendant was entitled to hold them subject to the examination of the plaintiff. (*Clark* v. *the Earl of Ormond, Jacob's Rep.*, 120.) But further light may be thrown upon this subject by an examination before a master.

1839. Fish v. Miller.

Pointed interrogations put to the complainant, as well as to the defendant, will show not only in whose possession the book and papers now are, but the character of the former, and its necessity for the defendant's protection. The court has always paid much attention to the fact of the surrender of vouchers, or other circumstances which, in conjunction with lapse of time, render an account impossible or oppressive. In addition to the observations of Lord Alvanly before cited, I may refer to the case of *Kilbee* v. *Sneyd*, before Lord Chancellor Hart, already mentioned, as to the great latitude given to the admission of secondary evidence, where there is reason to believe that vouchers are lost.

In decreeing an account, I shall therefore allow the master, upon the application of either party, to make a separate report as to the production or loss of the book and documents in question, and their general nature and contents. The court will then be prepared to settle the principles of accounting as to the admission of other evidence. Indeed such a case might be presented upon the report as to warrant the arresting any further account.

The following are the heads of the decree to be entered:

Refer it to one of the masters of the court residing in the city of New-York to take and state the usual accounts of the personal estate of John Fish, deceased, possessed or received by the defendant Ezra Miller his executor, or by any other person or persons, by his order, or for his use. *Also*, an account of the rents and profits of any real estate belonging to the complainant, or in which he had any interest, come to the hands of such defendant, as the guardian of such complainant or otherwise, and of the disbursements and expenses of the defendant in and about the same.

*Also*, an account of the proceeds or avails of any real estate belonging to the complainant, or in which he had any interest, come to the hands of the defendant, or of any person for his use, or by his order, and in what capacity he received the same.

*And also*, an account of any monies or personal pro-

1839. Fish v. Miller.

perty received by the defendant, or by his order, or for his use, on account of the plaintiff, or to which he was entitled, as guardian of the person and estate of the plaintiff, or otherwise, distinct from the executor's account before directed. And in taking such several accounts, the master is to make to the defendant all just allowances; and if he find that no regular charges have been made for the maintenance or education of the complainant, or is not satisfied with the propriety of such charges, that he inquire and fix a proper sum or sums to be allowed the defendant, for the support and maintenance of the complainant during his minority, unless he shall ascertain that the plaintiff was supported or educated for any part of such period, by any other person or persons; and in such case to regulate such allowance accordingly.

The usual directions to be given for the examination of all parties upon interrogatories or otherwise, as the master shall direct, and for the production of all books and papers. The master to be at liberty to receive interrogatories exhibited by either party for the examination of the other, touching the possession or control of a certain book of accounts, and certain vouchers, alleged in the deposition of Ezra Miller to have been delivered by the defendant to the complainant, and also touching the nature and contents of such book and vouchers, and to take testimony of witnesses as to the same, (other than of witnesses already examined in the cause to the same matter,) and such master may, upon the application of either party, make a separate report to this court of such examinations and proofs, that such order may be made as shall be just.

But prior to making such separate report, let the said master enforce, according to the practice of the court, a full and satisfactory production, under oath, of all books, papers, and documents, in the possession of the parties, or either of them, and let him certify in his said report, whether the books or documents before him appear to cover an account of receipts and disbursements of the defendant, for the whole or for what period of his accountability, and also to state any special circumstances.

The question of costs to be reserved, as well as all further directions, until the coming in of such separate or general report.