GARVIN'S ADM'R *et al.*, Appellants, *v.* JOHN P. WILLIAMS *et al.*, Respondents.

1. *Guardian and ward — Donations, how generally treated.*— Gifts, grants or donations obtained by attorney from client, spiritual adviser from advisee, trustee from *cestui que trust*, parent from child, and guardian from ward, are watched by courts with the most scrutinizing jealousy, and generally held to be presumptively void.

2. *Wills—Guardian and ward—Will to guardian by ward—Presumptions of law concerning.*—In a suit to set aside a will, it appeared that the donee became the guardian of deceased while the latter was a mere child; that deceased always resided in his family; that he surrendered everything to his guardian's judgment, and reposed the most implicit confidence in him in every respect; that a day or two after becoming of age, and while residing in the house of his guardian, deceased effected a settlement with him, and on the day following made his will, disinheriting all his kindred and relations, and conveying all his property to the guardian; that about a month afterward, and while still under his care, he died: *held,* that the will was presumptively invalid, and the burden of proving its validity rested upon those who sought to derive an advantage under it.

*Appeal from St. Louis Circuit Court.*

*Glover & Shepley*, with whom were *Harris*, and *Crews, North & Laurie*, for appellants.

Whenever any one standing in a fiduciary relation receives a benefit from his dependent, the law looks on the act with suspicion, and either holds it void or so far condemned as to require from the donee proof that no undue influence or fraud induced the transaction. But the court below decided that the fiduciary relation of guardian and ward attached no suspicion to, and raised no presumption against, the will; and further, that all the facts mentioned in plaintiff's second instruction did not fix on defendants the *onus* of disproving undue influence. Appellants contend as follows: .

I. The settlements made of the guardian's accounts, September 13, 1860, were invalid. (Hicks v. Hicks, 3 Atk. 247; Kilby v. Snead, 2 Molloy, 230; Revett v. Harvey, 1 Sim. & Stu. 502; Fish v. Miller, Hoffman's Ch. 273; Wedderburne v. Wedderburne, 4 Myl. & Cr. 49; Waller v. Armsted, 2 Leigh, 11; 1 Willard's Eq. 183, 185; in re Van Horne, 7 Paige, 46; Melish v. Melish, 1 Sim. & Stu. 138; 1 Sto. Eq. 355, § 317; Redf. on Wills, 20; Gorst v. Lownds, 11 Sim. 433; 1 Black, 463; 2 Kent, 233.)

II. The fiduciary relations subsisting at the execution of the will raised a presumption that it was procured by the undue influence of the guardian. (Jones v. Goodrich, 5 Moore's P. C. Cas. 20; 1 Sto. Eq. 311, 312, §§ 318, 320; id. §§ 260–307; Wells v. Middleton, 1 Cox's Ch. 112; Woodhouse v. Shipley, 2 Atk. 535; Marsh v. Tyrrell, 2 Hagg. Eccl. 84; Hylton v. Hylton, 2 Ves. Sr. 547; Swisshelm's Appeal, 56 Penn. St. 486; Hatch v. Hatch, 9 Ves. 292; Wright v. Vanderplank, 8 DeG., McN. & DeG. 146; Bury v. Openheim, 26 Beav. 598; Chambers v. Crabbe, 34 Beav. 459; Meek et al. v. Perry et al., 36 Miss. 243; Willard's Eq. 185; Taylor v. Taylor, 8 How. 199; Ormond v. Hutchinson, 13 Ves. 51; Morse v. Royal, 12 Ves. 370; Wright v. Proud, 13 Ves. 137; Gaither v. Gaither, 20 Ga. 721; Huguenin v. Basely, 14 Ves. 273; Von Stets v. Comyn, 12 Ir. Eq. 641–2; Dawson v. Massey, 1 Ball & B. 229; Ingraham v. Wyatt, 3 Hagg. Eccl. 466; Wood v. Downs, 18 Ves. 127.) The extraordinary value of this donation is of itself a ground of suspicion. (Taylor v. Taylor, 8 How. 183; Mulhazen v. Marum, 3 Dru. & War. 336; Popham v. Brooke, 5 Rus. Ch. 10; Griffith v. Robbins, 3 Mad. 105; Thompson v. Judge, 3 Dru. 315; Dent v. Robinson, 4 Myl. & Cr. 277; Harrell v. Harrell, 1 Duvall, 203; Custance v. Cunningham, 12 Beav. 363; Whelan v. Whelan, 3 Cow. 537; Sears v. Shaeffer, 6 N. Y. 272; Howel v. Hanson, 11 Paige, 598; Nottige v. Prince, 2 Giff. 269.) The general course of authority applies the doctrine of fiduciary relation to wills as well as deeds. In 3 White & Tudor's Leading Cases in Equity, 127, it is said that " the general rule is, a deed or will in favor of one who stands in the position of confidential adviser will be set aside unless the transaction is shown or appears

to be perfectly fair and regular, without any admixture of improper or undue influence." On this point *vide* 34 Conn. 451; Meek *et al.* v. Perry and Wife, 36 Miss. 256; Morris v. Stokes, 21 Ga. 575; Breed v. Pratt, 18 Pick. 117; Marsh v. Tyrrell, 2 Hagg. 84; Ingraham v. Wyatt, 3 Hagg. 466; Gaither v. Gaither, 20 Ga. 721; 1 Paige, 176; Middleton v. Sherburn, 4 Young & Colly, 358; Crispell v. Dubois, 4 Barb. 397; Lake v. Ranney, 33 Barb. 68; Newhouse v. Goodwin, 17 Barb. 258; Darley v. Darley, 3 Bradf. 507; Tyler v. Gardner, 35 N. Y. 559; Lee v. Dill, 11 Abb. Pr. 218; 3 Cow. 576. A careful reading of the cases above cited will show that in some of them the instruments in question have been void absolutely because of the fiduciary relation. In every one of them the presence of the relation has raised a presumption against the validity of the act, no matter what it was — will, deed, release, settlement, or bond. ( *Vide* further, Casborn v. Barshaw, 2 Beav. 78; 3 White & Tud. L. C. in Eq. 114–5; Crispell v. Dubois, 4 Barb. 397; Newhouse v. Goodwin, 17 Barb. 258; Lake v. Ranney, 33 Barb. 68; *in re* Greenfield's Estate, 14 Penn. St. 505; Smith v. Kay, 7 H. Lords, 779; Lee v. Dill, 11 Abb. Pr. 218; Hatch v. Hatch, 9 Ves. 292; Taylor v. Taylor, 8 How. 199, 202; Goddard v. Carlisle, 9 Price, 169; Archer v. Hudson, 7 Beav. 558; Osmond v. Fitzroy, 3 P. W. 131, n. 1; Maitland v. Irving, 15 Simon, 437; Chambers v. Crabbe, 34 Beav. 459; Maitland v. Backhouse, 16 Simon, 58; Sercombe v. Saunders, 34 Beav. 382; Espy v. Lake, 10 Hare, 262; Gale v. Wells, 12 Barb. 85; Darley v. Darley, 3 Bradf. 507; Bergen v. Udall, 31 Barb. 9; Davis v. Davis, 4 Giff. 417; *in re* Welsh, 1 Redf. Sur. 244; Nesbit v. Lockman, 34 N. Y. 167; White v. Meade, 2 Ir. Eq. 420; 3 White & Tud. Lead. Cas. 141; Morris v. Stokes, 21 Ga. 552, 575; Huguenin v. Basely, 14 Ves. 273; Vreeland v. McClelland, 1 Bradf. 420, and cases cited; Maury v. Silber, 2 Bradf. 134, 151; Redf. on Wills, 529.)

*Sharp & Broadhead*, and *Knox*, for respondents.

I. The instructions requested by appellants, and refused, were properly refused, because the existence or recent termination of

the relationship of guardian and ward does not raise a legal presumption of the invalidity of the will of the ward, but is a fact to be considered and duly weighed, in connection with all other facts in the case, in determining the question of undue influence. (Jones v. Goodrich, 5 Moore's P. C. Rep. 16–41; Butlin v. Barry, 1 Curtis' Eccl. Rep. 614; Barry v. Butlin, 1 Curtis, 637; Henderson v. Weatherell, 5 DeG., McN. & G. 301–313; Rhodes v. Bates, 1 Law Rep. Ch. App. 253; Dawson v. Macey, 1 Ball & B. 219; Redf. on Wills, 528, 531, §§ 41, 45; Reeve's Dom. Rel., ed. 1862, pp. 444, 445; Beard et al. v. Pratt, 18 Pick. 115; Morris v. Stokes, 21 Ga. 552; White v. Bailey, 10 Mich. 155; Jenckes et al. v. Probate Court of Smithfield, 2 R. I. 256 · Gaither v. Gaither et al., 20 Ga. 709; Means v. Means, 15 Ohio, 90; Newhouse v. Goodwin, 17 Barb. 236; Wilson v. Moran, 3 Bradf. 172.)

II. In proceedings to set aside a probated will, the presumption is in favor of the validity of the will (Farrell v. Brennan et al. 32 Mo. 323 et seq.; McClintock v. Curd, 32 Mo. 411; 8 Dana, 315); and it would be error and lead to confusion to instruct the jury that a certain state of facts raised a contrary presumption. It would at best but assert a presumption against a presumption, amounting to nothing, and only calculated to confuse. (Beacher v. Marsh, 15 Ohio St. 103; Copeland v. Copeland, 32 Ala. 512.)

WAGNER, Judge, delivered the opinion of the court.

This was a proceeding instituted in the Circuit Court of Chariton county, and taken, by a change of venue, to St. Louis county by the appellants, who are heirs at law and personal representatives of W. D. Peticrew, to set aside the probate of his will. The respondents are beneficiaries under the will.

It appears that the deceased, Peticrew, was left an orphan when a mere child, inheriting a large estate, and that he had neither brothers nor sisters. The respondent John P. Williams was appointed guardian of his person and curator of his estate; and from the time of such appointment Peticrew resided in the family of Williams till the time of his death, except when he was absent at school. During all this time Williams had the exclusive

management and control of the estate, and Peticrew seems to have given him his unreserved confidence.

Before Peticrew became of age he was attacked with consumption, and the record shows that it was painfully evident that he could not long survive. He was born September 12, 1839, and therefore arrived at age on the 11th day of September, 1860. Two days prior to his becoming of age an attorney was employed to examine the accounts between him and his guardian, and on the 13th of the same month a settlement was made in the County Court — Peticrew receiving the note of his guardian for the amount due him, and entering a release of record discharging him and his securities. On the next day, the 14th of September, Peticrew, still being at Williams' house, made and executed his will, giving the whole of his large estate to Williams and his family, with two exceptions, and totally disinheriting all his kindred or relations. In the succeeding month of December he died.

From the view we have taken of the case, as now presented, it will be unnecessary to comment upon or bestow any particular attention on the great mass of testimony embodied in the bill of exceptions. We must first examine whether the court below tried the case upon a correct theory.

Upon the trial the plaintiffs offered an instruction reciting all the facts in the case, and asked the court to declare, as a conclusion of law thereon, that the alleged will was presumptively procured by undue influence. The concluding paragraphs of the instruction are in these words: "And that the alleged will was made in the house of J. P. Williams, while said Peticrew was residing therein, on September 14, 1860, said Peticrew being only two or three days of age, and before the influence created over said Peticrew by the relations (guardianship) aforesaid had ceased to exist. The presumption arising from such facts is that the alleged will was procured by the undue influence of J. P. Williams, and that presumption can only be repelled by satisfactory proof that no undue influence was used to procure the same." This instruction the court refused to give.

There is no subject in the whole range of equity jurisprudence

where its salutary principles have been more often invoked than in those cases where donations have been obtained by persons standing in some confidential, fiduciary, or other relation toward the donor, and where they may have exercised dominion over him. Transactions of this kind taking place between attorney and client, spiritual adviser and advisee, trustee and *cestui que trust*, parent and child, and guardian and ward, are watched by courts with the most scrutinizing jealousy, and generally held to be presumptively void.

Whilst all those confidential relations are essentially governed by the same principles, we shall confine this discussion mainly to the law as adjudged and written in reference to guardian and ward. And here it must be observed that the rule is applied not exclusively while the relation actually exists, but for such period of time thereafter as may be sufficient to insure complete emancipation on the part of the ward, and afford him an independent and unbiased opportunity to investigate for himself and see that everything is correct.

Chancellor Walworth said, in one case, that it was not the practice of the court to discharge the guardian absolutely, and to order his bond to be given up immediately upon the infant's arriving at age, although he had settled with the guardian; that the ward, notwithstanding such settlement, was entitled to a reasonable time, after he became of age, to investigate the accounts of the guardian, and to surcharge and falsify the same if, upon such investigation, he found anything wrong. (*In re* Van Horne, 7 Paige, 46; Willard's Eq. 182.)

Mr. Justice Story discusses the question with his accustomed clearness. He says: "In the next place, as to the relation of guardian and ward. In this most important and delicate of trusts, the same principles prevail, and with a larger and more comprehensive efficiency. It is obvious that during the existence of the guardianship the transactions of the guardian can not be binding upon the ward if they are of any disadvantage to him; and, indeed, the relative situation of the parties imposes a general disability to deal with each other. But courts of equity proceed yet further in cases of this sort. They will not permit transactions between

guardians and wards to stand, even when they have occurred after the minority has ceased and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the terms, the fullest deliberation on the part of the ward and the most abundant good faith (*uberrima fides*) on the part of the guardian; for in all such cases the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased—as, if the accounts between the parties have not been fully settled, or if the estate still remains in some sort under the control of the guardian." (1 Sto. Eq. Jur. § 317.) The English editors of Leading Cases in Equity lay it down as settled doctrine that a donation from a ward to a guardian is looked upon with great jealousy; and if it has been obtained immediately upon the ward attaining his majority, it will be set aside upon the presumption of undue influence having been used by the guardian, and even a considerable time after that event, upon proof that the influence of the guardian over the ward still existed; and if undue influence can be fairly presumed from the relative positions of the parties, or proved, the trouble or loss of time the guardian may have sustained in fulfilling the duties of his office will not avail him as a defense or excuse for accepting or obtaining such a donation. (3 White & Tud. L. C. in Eq. 490.)

In Hylton v. Hylton, 2 Ves., Sr., 547, an uncle, who was trustee and acted as guardian to his nephew, upon coming to an account and delivering up the estate to his nephew, who was then about twenty-two years of age, took from him a general release and written discharge, and also a voluntary grant of an annuity of £60. Lord Hardwicke set the annuity aside upon a bill filed by the nephew. "Where," said he, in delivering his opinion, "a man acts as guardian, or trustee in the nature of guardian, for an infant, the court is extremely watchful to prevent that person taking any advantage immediately upon his ward or *cestui que trust* coming of age, and at the time of settling accounts and delivering up the trust, because an undue advantage may be taken. It would give an opportunity, either by flattery

or force—by good usage fairly meant, or bad usage imposed—to take such an advantage, and therefore the principle of the court is of the same nature with relief in this court, on the head of public utility; as in bonds obtained from young heirs, and rewards given to an attorney pending a cause, and marriage brokage bonds. All depends upon public utility, and therefore the court will not suffer it; though perhaps in a particular instance there may not be any actual unfairness."

In Hatch v. Hatch, 9 Ves. 292, a guardian, who was an incumbent of a living, obtained from his ward, soon after she became of age, a conveyance of the advowson of the living, expressed to be made in consideration of her great friendship, kindness, and regard for him, the care taken of her by him, etc.; and of ten shillings to his brother, who was the attorney who prepared the deed, and one of the attesting witnesses, and who afterward became her husband. She continued to live with her guardian for about four years afterward, when she married her guardian's brother; and sixteen years after her marriage, upon the death of her guardian, she and her husband filed a bill to be relieved against conveyance. Lord Eldon, considering that she had never been her own mistress, being with her guardian till her marriage, and with her husband since, notwithstanding the time that had elapsed, and taking into consideration the nature of the property, ordered the instrument to be delivered up and canceled.

In the course of his able judgment he declared: "This case proves the wisdom of the court in saying it is almost impossible, in the course of the connection of guardian and ward, attorney and client, trustee and *cestui que trust*, that a transaction shall stand purporting to be bounty for antecedent duty. There may not be a more moral act, or one that would do more credit to a young man beginning the world, or afford a better omen for the future, than if a trustee, having done his duty, the *cestui que trust* taking it into his fair, serious, and well-informed consideration, were to do an act of bounty like this. But the court can not permit it, except quite satisfied that the act is of that nature, for the reason often given." He adds that "in discussing whether it is an act of rational consideration—an act of pure

volition, uninfluenced — that inquiry is so easily baffled in a court of justice that, instead of the spontaneous act of a friend uninfluenced, it may be the impulse of a mind misled by undue kindness, or forced by oppression. And, therefore, if the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases it will lend its assistance to fraud."

Again, in the case of Huguenin v. Basely, 14 Ves. 299, the same learned chancellor reviews the cases, and places his decision on the ground of public utility; and in Wood v. Downes, 18 Ves. 127, the same doctrine is reiterated. Since those decisions were rendered there are many cases reported in the English books, some of which might seem to qualify or mitigate the stringent and inflexible rule laid down by the early chancellors; but an examination will show that where gifts or donations have been upheld, between parties where confidential relations existed, it has been under special and peculiar circumstances, and where an entire absence of undue influence was apparent.

Where a case comes fairly within the rule we do not see that it is in the least abated. In the case of Gale v. Wells, 12 Barb. 84—where a guardian, soon after the ward became of age, but while the latter was still at college, and before the guardian had settled his accounts with the ward, procured the ward's indorsement to a note made by the guardian for the payment of a precedent debt owing by the guardian to a third party, who took the note and indorsement with notice of the relations between the maker and indorser — it was held that the note could not be enforced against the ward. The court declared that the law inferred undue influence in such a case, without allowing an inquiry as to whether it actually existed or not, on account of the difficulty of establishing it and the danger to wards of leaving that question open while the relationship of guardian and ward existed.

In Meek et al. v. Perry et al., 36 Miss. 190, David McKinnie died, leaving two daughters, Mary and Louisa. Michael McKinnie, their uncle, qualified as their guardian. Five months after Louisa had arrived at age, being in low health, she made her will, giving all her property to her uncle, the guardian, and disinher-

iting her sister, and died four days afterward. The Supreme Court of Mississippi set the will aside, and said that in transactions between guardian and ward, the law, upon a principle of public policy, and to protect the ward against the efforts of over-weening confidence and self-delusion, and the infirmities of a hasty, precipitate judgment, presumed the existence of undue influence on the part of the guardian, and therefore such dealings were *prima facie* void, and would be so held unless the guardian showed, by the clearest proof, that he dealt with the ward exactly like a stranger, taking no advantage of his influence over him, or of his superior knowledge in relation to the subject matter of the transaction, and that the ward's act was the result of his own volition and upon the fullest deliberation. (See, also, Gaither v. Gaither, 20 Ga. 721; Taylor v. Taylor, 8 How. 183; De Montmorency v. Devereux, 7 Clark & Fin. 188; Wells v. Middleton, 1 Cox, 125; Fish v. Miller, 1 Hoff. Ch. 273.)

One of the ablest, most satisfactory, and clearest-reasoned cases that I have seen, concerning grants or donations to persons occupying confidential or fiduciary relations, is Greenfield's (2 Harris, 489). There the court held a grant by a woman eighty-six years of age, of all her property to four persons in trust, to apply the proceeds to her support during life, and to sell and distribute the whole after her death, valid—thus sustaining her capacity to grant—but struck out a gift or bequest of $10,000 to each of the trustees, on the ground that one was her friend and confidential adviser, and another her attorney, and that there was nothing to take the case out of the general rule that gifts to agents and trustees are *prima facie*, if not absolutely, invalid. In their most lucid opinion the court say: "The deeds were prepared by Mr. Bouvier, who for some time prior had been the legal adviser and confidential attorney of Mrs. Greenfield. In this instance he acted upon the express suggestion and recommendation of Mr. Howell, in whom the donor reposed the most implicit faith. It is evident that both of these gentlemen exercised over her an almost unbounded influence, and were thus enabled to give direction to her thoughts and actions. Mr. Rush also stood toward her in a fiduciary relation; and the

fourth trustee, Mr. Roberts, was brought into the business by Mr. Howell, under a recommendation well calculated to command her utmost trust. For a considerable time before the conveyance it is proved she was improvident, if not extravagant, in the expenditure of her fortune, and, in reference to it, singularly open to solicitation and importunity. In the language used at *nisi prius*, she was generous to a fault, and seems to have been haunted by a passion for giving. While indulging this inclination for expenditure, the deeds in question were made. By these is reserved to the trustees the sum of $40,000, being $10,000 to each, professedly as a compensation for assuming the burden of a trust which might have been terminated in a year, and, according to every probability, would not endure for a very long period. As the award for the future management of an estate worth at the utmost only five times as much, the sum named has been designated as inordinate; yet this fact will by no means justify a charge of actual fraud against the parties who principally managed this transaction. As already intimated, there is no proof in the cause to warrant so grave an accusation, especially against individuals enjoying the eminent reputation which all accord to these trustees. I can very well imagine how, without a violation of conscience, they might conceive themselves entitled to a princely remuneration under the circumstances then surrounding the donor. But, in spite of this concession, a rule of public policy and pure morals, founded in long experience of the human heart and knowledge of man's cupidity, interposes to forbid an allowance of the claim. In this feature the case presents what is called a constructive fraud springing from the confidential relations existing between the parties. This peculiarity, withdrawing it from the operation of ordinary rules, throws upon the beneficiaries the duty of showing expressly that the arrangement was fair and conscientious beyond the reach of suspicion. In requiring this, courts of equity act irrespective of any admixture of deceit, imposition, overreaching, or other positive fraud. As it has been often said, the principle stands independently of such elements of active mischief. It is founded upon a motive of general policy, and is designed to protect a party, so far as may

be, against his own overweening confidence and self-delusion, the infirmities of a hasty judgment, and even the impulses of a too sanguine temperament. It has been beneficially applied to those confidences which owe their birth to the relations of parent and child, guardian and ward, trustee and *cestui que trust*, and, above all, attorney and client. To guard against the strong influences which these connections are so apt to originate, the law not only watches over the transactions of the parties with great and jealous scrutiny, but it often declares transactions absolutely void which between other parties would be open to no exception."

From the foregoing authorities, and many others which might be cited, it will be seen that the rule in regard to the bestowment of gifts, grants, or donations, where a trust or confidence exists between the parties, is well established. That cases may be found in which it has been relaxed, or where judges, owing to particular circumstances, have denied its application, is not doubted. But the rule is just in itself, founded on high principles of morality, public policy and utility, and its force ought not to be impaired. It is, however, contended that, although it may be applicable to deeds and transactions between the living, it does not extend to wills. But I am unable to perceive any distinction, either in reason, principle, or authority. The text writers speak of the rule generally, and apply it to all transactions alike, and many of the cases are direct adjudications where wills were in issue. Mr. Greenleaf, in his treatise on the law of evidence, lays down the doctrine "that being under guardianship at the time is *prima facie* evidence of incapacity, but open to explanation by other proof."

The case of Breed v. Pratt, 18 Pick. 115, is clear and conclusive upon the subject of guardian and ward, where a will was made during the existence of that relation. Although the direct question there was the mental capacity of the testator, still the remarks of the court are equally applicable to the one now under consideration. Shaw, C. J., in delivering the opinion of the court, said: "Inasmuch as the relation of guardian and ward places the person and property of the ward in the custody of the guardian, where a will is made beneficial to the

guardian, it is to be taken as strong evidence bearing upon the point of the mental capacity of the testator and his freedom of will and of action; but it is to be taken as evidence which may be met and controlled by counter proofs. It is *prima facie* evidence of insanity and incapacity to make a will; and therefore it is incumbent on those who would establish the will to show, beyond reasonable doubt, that the testator had such mental capacity and such freedom of will and action as are requisite to render a will legally valid."

It would be indeed strange and remarkable if any distinction were made, and the doctrine did not apply to wills; that the law should watch with such extreme jealousy, and throw every safeguard around the living, and deny it to those who were just ready to sink into the grave on account of disease; that, on grounds of public utility, men of health should be protected because by reason of certain confidence they were placed in a situation where they were liable to be imposed on, yet when they were placed in the same relation, emaciated by sickness, and bereft to a great extent of their intellectual capacity, they should fall a prey to cupidity and avarice.

When advantage is taken of persons living, and they have been deprived of their rights by undue influence, their wrongs may be made known, and a remedy is easily afforded; but where a will is procured from a person stricken with disease from which he never recovers, who is to disclose the injustice which has been perpetrated and unfold the means which led to its execution? It is true that while the testator is living, his will is ambulatory, and may be altered or revoked; but this principle is of no consequence when he is induced to make and publish it in view of impending death, when no opportunity of reconsideration is open to him. In this case young Peticrew resided in the family of Williams; the evidence shows that he surrendered everything to Williams' judgment, and that he reposed the most implicit confidence in him in every respect. How that confidence was acquired, and with what view, we will not stop to inquire. The extraordinary haste with which the settlement was pushed immediately on the ward's coming of

age, and the rapidity with which the will followed on the next day, needs explanation.

At the time of making the settlement, Peticrew was too sick to attend to any business, and manifested little or no interest in what was going on; his declaration in regard to the whole matter was that he had confidence in Williams, and supposed it was all right. When the settlement was concluded he returned to Williams' house, and there, on the next day, made his will. It does not appear that Williams or any of his family who are beneficiaries were present in the room at its execution; but if they were instrumental in procuring the disposition that was made of the property, they would most probably be absent. The hand that directs such acts most generally withdraws from the public gaze. Then Williams started south with Peticrew, and was with him till he died.

In all this there may have been nothing unfair or unjust. The kind treatment that Peticrew received from Williams and his family may have sprung from generous and disinterested motives, and not resulted from selfish or sinister purposes. But they are the only persons who are capable of explaining the matter satisfactorily. Williams was placed in a confidential relation, where the most exact good faith was required of him — where it was incompetent for him to take a benefit for himself without showing that the benefit flowed from the free, unbiased, independent will and uninfluenced volition of his ward.

Under the circumstances in which the will was made it was presumptively invalid, and the burden of proving its validity rested upon those who sought to derive an advantage under it. The instruction, therefore, hereinbefore alluded to, which was refused by the court, should have been given. I have not been able to find any other error in the record.

That young Peticrew labored under a delusion in respect to the designs of his aunt Garvin will not admit of a moment's doubt. His declarations were competent to show the state of his mind, but they were not admissible against the defendants to prove that they had used the language which poisoned him against his

relatives.   They were mere hearsay, and therefore the court did not err in rejecting them.

The judgment must be reversed and the cause remanded for further proceedings in conformity with this opinion.   The other judges concur.