SILAS W. MILLER ET UX., Appellants, *v.* JACOB W. SIMONDS, Respondent.

January 2, 1878.

1. Where a disposition of property in favor of the grantor's father and former guardian is made by one in his early majority, courts of equity will look very narrowly into the question how far the transaction was advantageous or otherwise desirable for the grantee; and where the pecuniary advantage is on the side of the grantee, the burden is on him to show that the transaction was free from every element of influence over the grantor's mind, growing out of the former relations between the parties.

2. It is immaterial, in equity, that the gift from a daughter to her father and former guardian was made three or more years after the minor's technical majority, where it is shown that the grantor's habits of submission and dependence, contracted during minority, remain unchanged, and that at the time the gift was made the grantor was motherless, resided with her father, the grantee, and had no other protector.  In such a case, equity will extend the legal term of disability.

3. Where a conveyance has been procured through undue influence exercised upon the grantor, it is immaterial whether this influence was that of the grantee or of a third person.

APPEAL from St. Charles Circuit Court.

*Reversed and remanded.*

WILLIAM A. ALEXANDER and LACKLAND & BROADHEAD, for appellants: The burden of proof as to undue influence rests upon defendant. — *Street* v. *Goss*, 62 Mo. 226.  Equity will, in cases like the present, extend the term of legal disability beyond the technical majority of the ward. — *Garvin's Administrators* v. *Williams*, 44 Mo. 465; 50 Mo. 206; *Huguenin* v. *Baseley*, 3 White & Tudor's Ld. Cas. 47, 55, *et seq.*; *Archer* v. *Hudson*, 7 Beav. 521; *Rivett* v. *Harvey*,

1 Sim. & St. 502; *Jennings* v. *McConnell*, 17 Ill. 148; 1 Story's Eq., sec. 309; 12 Pet. 261; *Young* v. *Peacy*, 2 Atk. 258; *Bergen* v. *Udall*, 31 Barb. 9; *Taylor* v. *Taylor*, 8 How. 183. Where undue influence is exercised, it is immaterial whether it be the influence of the grantee, or person who receives the benefit, or a third person. — *Highberger* v. *Stifler*, 21 Md. 338; 6 Ves. 278; and cases cited in 3 White & Tudor Ld. Cas. 123, 2 White & Tudor Ld. Cas. 64–66.

T. BRUERE and McDEARMON & GAUSS, for respondent, cited *Garvin* v. *Williams*, 44 Mo. 470.

LEWIS, P. J., delivered the opinion of the court.

The plaintiff, Margaret J. Miller, is the daughter of defendant, who, in 1860, was regularly appointed guardian of her person and estate, she being then about seven years of age. Her property consisted chiefly of an undivided half of three hundred and ten acres of land, worth, according to the testimony, about $18,000, which she and her only brother, William T. Simonds, had inherited, in part from their mother and in part from an uncle on the mother's side. The defendant was also guardian of his son, and the two wards reached their majorities, respectively, in 1871. On May 18, 1874, a few weeks before the marriage of Margaret with her co-plaintiff, a deed was executed by the two children, conveying to their father, in consideration of love and affection and the sum of one dollar, a life-estate in their tract of land. This suit is to set aside that conveyance as to the plaintiffs, because of undue influence in its procuration. The Circuit Court decreed in favor of defendant.

It appeared from the evidence that Margaret's mother died when she was about two years old. Her father married again, but lost his second wife when Margaret was eleven or twelve years of age. From that time until her marriage, excepting a short attendance at a boarding-school in the same county, she lived with her father and brother, the

three composing the whole family. Their dwelling was situated on a tract of eighty acres, in which the defendant held a tenancy by the curtesy, and which was part of the land owned by his children. The defendant raised and educated his wards, and cultivated and improved their land, but kept no account of either receipts or expenditures, and made no settlements of his guardianship. It was about three years after the wards had become of age when defendant's sureties pressed him to make a final settlement, and obtain his and their discharge. Margaret was then engaged to be married, but her father was strongly opposed to the intended match. It seems to have been with a view to closing up the guardianship and satisfying the sureties that defendant, on May 18, 1874, took his wards into the city of St. Charles, and to the office of his legal adviser, Judge Andrew King. What then occurred may be best understood from the testimony given by some of the witnesses. The plaintiff Margaret Miller said: " My father managed and controlled my real estate. I relied on him in its management. I had no other property except the land conveyed by the deed. I was always under the impression that my father had other property besides this ; I never thought much about it. My brother came home on Saturday, and mentioned it to me. He was the first and only one who ever mentioned it to me up to that time. I never thought of it before ; that was on Saturday. On Monday I made the deed. He spoke of it, and said he thought it would be right. We came in on Monday, and made the deed. I never spoke to any one about it from the time he spoke, on Saturday, until Monday. A few minutes before I signed it, pa spoke to me about it. This was on the porch, or hall, of Judge King's office. I was not very well, was the reason I was out there. Father then told me he had plenty, and I need not sign it unless I wished. This was just before I signed it. My father went in with me to sign it. We all went in together. William T. Simonds was

there when I signed it, also.  My brother ordered the writing.  I don't have any recollection of saying any thing about it.  I suppose my brother selected the attorney to write the deed.  He took me there.  I didn't comprehend all I was doing in signing that deed; I never knew what I was doing; on Saturday, my brother told me about the property more than I ever heard before, and that we ought to convey it to pa for his lifetime, because he was old, and he thought it best for us to do it; and I very readily gave my consent, without thinking any thing about it.  My father had only on one occasion spoken to me about it, a short time before, and told me he heard I was going to turn him out of house and home.  I asked him who told him so, and wanted to know how he thought I could possibly do such a thing, even if I desired.  He refused to tell me who told him, and said he never would tell me who told him.  There was very little more said.  I was then engaged to Mr. Miller at that time.  I think he knew it.  This conversation was shortly before the deed was made.  My father was opposed to my marriage with Mr. Miller.  My brother came home from St. Louis on Saturday evening, a little before sundown, the Saturday before the deed was made.  He spoke to me, soon after he came home, about making the deed.  He said to me, father had raised and clothed us; that we ought to have it fixed so that father could enjoy it in his old age.  In most things, I had followed the directions of my brother.  About this deed and the property, I then followed his advice.  Before, I didn't think, or know, much about it.  My brother only spoke to me once about it, that night.  My brother was not at home on Sunday, and came home Sunday night.  I was at home all day Sunday, and Sunday night.  I talked to no one else about it (the deed).  We came to town early Monday; I wasn't well at the time; was sick all day Monday when I signed the deed; was sick when I left home that morning.  I don't remember any thing definite about it that day; I was sick all day.

I would never have thought of making the deed, had he not mentioned it. I would not have done it of my own accord. I thought the land was through my mother; but, in fact, I never thought any thing about it. My brother never said much about my contemplated marriage with Silas Miller. I didn't think he was exactly willing, but he never said much about it. After I signed the deed, my brother went back to St. Louis. I and my father and my brother came into town together in the wagon. We got in between ten and eleven o'clock, and went straight to King's office. * * * The deed was executed on May 18, 1874, and I was married June 11, 1874. I received no money from my father for the deed."

Upon cross-examination, she said : " I went to Pitman's school two terms and a half. I quit school, I think, about four years ago. I stayed with my father until I married. I boarded at Pitman's when at school. At the time I signed the deed, I knew I had an interest in the property, but didn't know how much. There was no conversation between myself and father between Saturday and Monday; when the deed was made. It was not mentioned on the way into town. * * * I was then twenty-one years old. I was not insane or crazy at the time I signed it. I understood it was a deed, but did not realize what it really was. I didn't comprehend it. I understood the language, of course. * * * My father, on the porch, told me he did not need it (the property); that it would be a burden to him, and he would get along better without it. I don't think it was as much as a month from the time father spoke to me about turning him out of house and home, till the deed was made. * * * I gave father a receipt that day, but what I thought was that it was for $70. * * * I have no recollection of its being explained to me. * * * I knew — I had been told — I had property, but as to the quantity I did not know. I never thought seriously about the deed after I executed it, until after I married, — that is,

not much, or seriously. I thought about it on my own reflection. I didn't see where I had done wrong, until after I had married. I thought about it from my own reasoning, and not upon suggestions from others. * * * I think I was not as capable of judging for myself when I signed the deed as I was afterwards. Silas Miller did not first suggest to me the impropriety of my signing the deed; I first thought of it myself. It has been spoken of by many since. I mentioned it to my husband, and thought the matter would be repaired; my husband thought not. Pa had told me, on one occasion, I could have it back again; just before I was married. He complained to me of some bills. I told him I had to depend on him for every thing, and he said he would give it back whenever I wanted it. My father never used any improper or undue influence of any nature to induce me to sign that deed. We had but little help at the marriage; I assisted myself. * * * When we talked about making the deed (Saturday), my brother knew of the marriage contemplated. * * * I don't think father raised any objections to receiving the deed when presented to him. I think my husband has had great respect for my father, but he has had cause not to feel kind towards him. I do not think they speak. * * * My husband and I were born and raised in the same neighborhood, and associated together while children. Father told me, shortly before the marriage, he would give me back the deed. In the winter before I was married, I asked him for the deed back. I reminded him of his promise. He said he could not do it. I asked once or twice again after that for the deed. He said he never wanted me to mention it again, — that he couldn't do it. It was about a week before the marriage that he said he would give me back the deed. * * * When I signed the deed, I knew my father was opposed to my marriage with Mr. Miller. I don't know what motive I had in signing the deed; I had no motive. I don't know that the hope of

influencing my father in favor of the marriage influenced me in signing the deed. * * * I understand what the words 'grant, bargain, and sell' mean. I understand what the words 'to have and to hold during his natural life' mean. I did when I signed the deed. I understood the object was for the deed to give him the land for life."

The defendant testified, in effect, that he came to St. Charles on the Saturday before the deed was written, to meet his son, who had come to get some money; he told his son of Robert Miller's request to settle up the curatorship, and afterwards told both of his children he would bring them to town to settle the same. He did not discuss the manner in which he would settle; and, as Judge King was familiar with it more than himself, they would go to him. When they got to town, his children got out at Judge King's office, and he went down to put up the horses. He was gone some time; went before dinner to Judge King's office, and met his son and daughter at about the door of the office. They informed him that they had made a deed to him, and he insisted that they should do no such thing; told them he had raised and educated them, and had taken care of their property up to that time, and they would better take their property and do as they pleased with it. He had about $1,200 in the bank, a crop of wheat not sold, and one in the field; that he would take this and his personal effects, and buy a little home of his own; that his daughter then remarked, "I feel this is just what we ought to do. You have educated and raised us, and we have given you a home when you are old." After he had remonstrated all he could, he said it would be a trouble taking care of it and paying the taxes, and he would rather they would keep it. He thinks the deed was then written. Whether they had signed it he can't say, but it was before it was delivered to him; the receipt was also delivered that day. The settlement of the curatorship was his entire business in town,

except bringing in his son to go to St. Louis. There never had been a word said to him about this deed, nor had he ever spoken or written to his son about it before the day on which it was executed, nor ever to his daughter. No idea of such deed from them had ever been entertained by him. When Judge King was told that the children were of age, he informed them that they had only to give their father a clear receipt, if they were willing to do so. They said they were satisfied. When his daughter wanted him to give her back her interest in the land, his answer was, that he was not prepared to say any thing about it, and that he had not expected such an application. She had been frequently at his house, and that was the first time she mentioned it to him. Along that winter she again spoke of it, when he told her he would not. His reasons were, that he thought the land was safe in his hands, and that when he was gone it would be safe for his children. As to the conversation about the bills, he did not mean that he would really give her back the property; but merely to quiet her about bringing the charge against him that he had got all she had.

In the cross-examination, defendant testified that he was fifty-five years old. His daughter and he had had no trouble, except about the marriage with Miller. As to other matters, she was obedient, and did what he requested. He had acted the part of both mother and father.

Rudolph Hillenkamp testified that, in August, 1874, he had a conversation with William T. Simonds, who declared his opposition to the marriage of his sister with Miller, but said that "it made no difference; that his sister was all he got; that the other part we had fixed before."

William T. Simonds, a practising physician, testifying about the execution of the deed, said: "I remarked to my sister that father was getting old; that I had a profession which would support me; that I had heard she was going to get married, and that her husband would support her; and suggested the idea to give him (father) a home;

we had better give him a deed during his lifetime; that at his death it would naturally revert back to us. She said she thought it was a good idea; it is the thing we ought to do; that he had spent all he ever made, and raised us. I remarked that giving him the property would be a stimulus for him to improve it; and that, when it did come into our hands, it would be worth that much more. She asked me when we would make this deed to pa. I said Monday; as I had to go to St. Louis, we might as well fix it up then. Nothing more was said then. Pa came home that night, and said Robert Miller told him to make a settlement of curatorship, and we must go to town Monday and fix it up. Nothing was said about the deed at all. * * * King got the papers, came back, and wrote the deed. About that time, father came back, and we told him what we had done, sister and I. He said he did not ask it of us, he had enough to live on without it; that we could do with it as we pleased. We both remarked it was what we wished to do, to secure him a home. * * * I told my sister, if she didn't approve it, not to sign it; not to put a mark to it. She said it was just what she wanted to do. * * * On the Saturday previous to signing the deed, and in Judge King's office, were the only conversations we had about the deed. I told her the property came by her mother, through inheritance; that we had a half interest, as was fully understood. I never, at any time, spoke to my father about making the deed, until in the office, on the day it was made; nothing was said about it on the trip to town. My sister made no objections to coming to town that day. I can't say she was sick. She never was right well. Her mind is as good as any one's. She has more than an ordinary education and understanding. She was not unusually excited the day she executed the deed. She seemed to understand what she was doing. * * * I remember saying 'we had fixed the thing up,' meaning my sister and I, — not my father. That was after the marriage, and after

the deed was made.   *   *   *   I meant it was all Silas
Miller did get,—my sister.   I meant by that other matter,
that I and my sister had put the property in father's hands.''

It appeared in evidence that, at the time when the deed
was executed, the brother and sister gave to their father a
paper purporting to acquit and release him of all indebted-
ness to them as their guardian.   Their personal estate in
his hands consisted of the proceeds of a note for $80, with
compound interest from 1860.

John G. Miller, a witness for plaintiff, testified to a con-
versation, in which the defendant '' said that he was in
trouble ; that he did not care for himself ; that his life was
not worth any thing to him ; that if certain ones crossed his
path, and Silas Miller was one, he didn't know what would
be the consequence.   His daughter's marriage was talked
of, too.   He said he was opposed to the wedding of his
daughter to Silas, and that I knew that.   He said he was
bitterly opposed to it.   *   *   *   Robert spoke of the prop-
erty, and suggested the property might change hands.   They
were twenty-one, and it was theirs.   He said he knew that.''
This conversation occurred a short time before the mar-
riage.

The law assumes that an infant has not the discretion to
manage or dispose of his property, with those clear percep-
tions which pertain to maturity, of advantage or disadvan-
tage to himself.   Between this season of incapacity and its
opposite, an arbitrary line is drawn at the nineteenth or
twenty-second birth-day, according to sex.   On the day
next before this, he can be trusted to do nothing with his
own.   Yet in the ensuing forty-eight hours he becomes
competent to dispose, if so inclined, of every thing he has.
Equity, however, while it follows the law in holding to the
infant's incapacity up to the last day of his minority, will
yet, for certain purposes, extend the term of disability when
the reason for its recognition has not ceased.   A reason
most generally effective in that direction is the natural influ-

ence over the mind of the ward, which must result from long-continued habits of deference to the guardian, with a sense, greater or less, of dependence upon him. A mere suggestion from the recent guardian, especially if he be also the parent, may be more potent, as a rule of conduct for the young adult, than all forms of persuasion coming from other sources, even though backed by his own unpractised judgment. Hence, when a disposition of property in favor of a former guardian is made by one in his early majority, courts of equity will look very narrowly into the question how far the transaction was substantially advantageous, or otherwise desirable for the grantor. The prospect as to pecuniary gain or loss is not, however, the essential test. Motives of gratitude or affection, if spontaneous or well founded, may as reasonably be the basis for such a transfer as for one made by any other adult, or to a person other than the guardian. But if all the pecuniary advantage be on the side of the grantee, the burden is strongly on him to divest the transaction of every element of influence over the grantor's mind, growing out of the former relations between the parties. In *Archer* v. *Hudson*, 7 Beav. 557, Lord Langdale said: "If there be a pecuniary transaction between parent and child, just after the child attains the age of twenty-one years, and prior to what may be called complete emancipation, without any benefit moving to the child, the presumption is that undue influence has been exercised to procure that liberality on the part of the child. And it is the business of the party who endeavors to maintain such a transaction to show that the presumption is adequately rebutted." In *Bergen* v. *Udall*, 31 Barb. 9, the court said: "A transaction like the present, in which a daughter, immediately upon her arrival at age, makes a voluntary conveyance for the benefit of her father, will be examined by the court with the most jealous scrutiny and suspicion. The person relying upon it must show affirmatively, not only that the person who made it under-

stood its nature and effect, and executed it voluntarily, but that such will and intention was not in any degree the result of misrepresentation or mistake, and was not induced by the exertion, for selfish purposes and for his own exclusive benefit, of the influence or control which he possessed, as a father, over his daughter.''

Defendant's counsel here lay much stress on the fact that, at the time when the deed was executed, the grantor was twenty-one years of age, or in the third year of her legal majority. No time can be fixed for the duration of such a parental influence as may be abused after the guardianship has ceased. Each case must be determined by its peculiar circumstances. In the one before us, the testimony is ample to show the correlative habits of submission and authority, of dependence and protection, as fully exhibited between the daughter and father when this deed was executed, as they had been during her minority. She was still living under the defendant's roof, having no other protector. She had been kept at a boarding-school by him for more than a year after attaining her majority. It was with reference to certain events that had occurred about the time of the execution of the deed, that he testified of her obedience to him, and of his having '' acted the part of both mother and father.'' Whether three or more years have elapsed since the minor's technical emancipation is immaterial in equity, if the moral relations between the parties remain unchanged.

It is necessary to observe that, when a conveyance is liable to the objection of undue influence operating upon the grantor, it is wholly immaterial whether the person from whom the vitiating influence proceeds be the grantee or a third person who derives no benefit from the transaction. In the case of *Ranken* v. *Patton*, recently decided by our Supreme Court, and not yet reported, this rule is emphatically affirmed, with citations of numerous English and American authorities. That case and the present one are,

in their important features, so strikingly alike that it would appear difficult to apply any course of reasoning to one which would not equally fit the other. We find, in fact, in the points there settled, and the conclusion reached by the Supreme Court, a controlling authority for our treatment of the case in hand.

Robert Ranken died in St. Louis, in 1849, without children, and intestate, leaving a large estate. His brother David, claiming to be the only relative not an alien, took possession as sole heir of the property. There was a sister living in Ireland, whose descendants, figuring in the subsequent litigation, were three children, Mary, Sarah, and Thomas R. Patton, and two grandchildren, Sarah and William Marcus Patton, the offspring of another son. These grandchildren were born in Philadelphia. Proceedings instituted in their behalf resulted in a compromise with the legatees of their great-uncle, David Ranken, by which they acquired one-fourth of the estate, valued at about $240,000. In 1865, Sarah Patton, the younger, then twenty-three years of age, was living in Ireland, with her grandmother and her two aunts, Mary and Sarah, who had raised her from an orphaned infancy. William Marcus, her brother, was doing business with his uncle, Thomas R. Patton, in Philadelphia. This young man had reasoned himself into the belief that upon himself and his sister rested a moral obligation to make their two aunts and their uncle, Thomas R., equal with themselves in the property which had come from their great-uncle Robert, notwithstanding the law, which, by reason of existing alienage, had declared otherwise. He wrote his sister to this effect, proposing that they should convey one-half of their respective shares. Sarah wrote to her uncle Thomas, to be advised of her duty in the premises. He answered, refusing either to advise or to accept for himself any such conveyance. In one letter he said: "Now, in this matter, I cannot advise you. Your brother made a deed to them [the aunts] of a certain

part. I did not object to it; I would give him no advice or counsel in the premises. His act was wholly voluntary; yours must be so too. In justice, I think it is entirely right and proper; but you must govern yourself, and be the judge. There is no law compelling you, or can compel you, to do so." In another letter, referring to the transfer made by William Marcus and wife, he wrote: "I did not advise them, neither did I oppose their doing so, nor interfere in any way more than I have with yours; because, although there was no law binding such an assignment, I deem it a matter of common justice and honesty." Sarah wrote to her brother: "I have made up my mind, as you say uncle would give you no advice. So it must be quite right when he neither said with nor against it; so you may send the paper spoken of, and be sure to address it to Miss Patton, Junior, Crindle Cottage, Myroe, Londonderry." William Marcus thereupon, having executed and transferred his deed, sent to his sister a similar one for her execution and delivery. The scene that resulted is described in the testimony of the two aunts, substantially as follows: Sarah offered the deed, saying, "Aunt Mary and Aunt Sarah, accept of this from me, a portion of my property. I give it the same as my brother, William Marcus, gave it. I give it voluntarily to you." Mary handed back the paper, with the words: "Sarah, I do not require this; I have enough of my own." Said Sarah: "Aunt, accept of it. It is yours by right, though mine by law." With the other aunt the formula was repeated on both sides, in nearly the same words. Thus pressed by the grantor, the grantees accepted the deed. Sarah afterwards married, and suit was instituted for a cancellation of the instrument. In the Supreme Court, Judge Napton, delivering an elaborate opinion, declared that the conveyance should be annulled.

Comparing that case with the one before us, we discover some remarkable parallels. In each we find a brother and sister just past their respective minorities. The sister yet

remains under the protection and tutelage of the guardian of her infancy, who is to become the object of her bounty. The brother is freed from all associations of dependence, and yet conceives that a high moral duty, resulting, in the one case, from the demands of gratitude, and, in the other, from those of common justice and honesty, requires that he and his sister shall execute a voluntary conveyance. He impresses this upon the sister, to whom such an idea has never occurred. He demonstrates the sincerity of his conviction by himself making the same sacrifice to which he exhorts her. The instincts of youthful experience yield more readily to the calls of a higher sentiment than to the practical suggestions of pecuniary advantage ; and so, she will not be outdone in either gratitude, justice, or generosity. She adopts as her own the reasoning devised by her brother. She knows little or nothing of the value of what she is about to give away ; but she feels assured that it is right for her to give it, because her brother has told her so, and no one has said the contrary. The brother, selecting an attorney, directs the preparation of the necessary papers for her signature. She offers the gift. The donee declines it, having already enough for the needs of an unpretentious life. The giver insists, repeating the formula precisely as it came from her brother. This the donee finds irresistible, and yields to its persuasive power, although not in the least degree needing or desiring the bounty. The donor's marriage, soon afterwards, induces a graver consideration of the practical affairs of life, and she seeks, through the courts, to undo the folly which had ignored the claims and responsibilities that were to be a part of her new condition.

In all these particulars, either one of the two cases is a mere reproduction of the other. With so many points of coincidence, a departure in their conclusions cannot be well grounded on the few and slight differences appearing in other features. One of these differences appears in the fact that in the Ranken case the influence of the uncle,

Thomas R. Patton, was considered as having been largely instrumental in bringing about the conveyance. It would seem, however, to have been rather his neutrality that left the mind of the grantor thoroughly subject to the persuasions of her brother. "It must be quite right," she wrote to William Marcus, "when he said neither with nor against it." "Therefore," she might ,have added, "I do as you advise." The uncle's suggestions about justice and common honesty may well have added some force to the impressions made on the mind of an inexperienced girl; but the impressions were, nevertheless, the direct work of the brother. Besides his letter or letters to her, he had written a long and argumentative one to his aunts, intended to demonstrate the moral necessity of the proposed conveyances. In this connection, Judge Napton remarks : "Whether this letter was communicated to the plaintiff or not is a matter not satisfactorily established. We have not examined this point very particularly, because our opinion is that it is not material to an adjudication of the main question. There is no doubt that Thomas R. Patton, the brother of the two grantees and the uncle of the grantor, was principally influential in procuring this conveyance; in fact, that the deed was made at his suggestion, without the least examination of the plaintiff into the grounds upon which such a conveyance was urged upon her, and without any means furnished to her by which an intelligent examination could have been made. The only motive of the plaintiff was to comply with the wishes of her uncle, and to gratify her aunts. The letter of her brother to her aunts, if communicated to her, contained material misrepresentations of the history of her title." All the prominence here given to the agency of the uncle is manifestly due to the niece's distinct perception of his wishes, rather than to any active urgency on his part. This incident also has its counterpart in the case before us. The defendant's suggestion to his daughter that she was "about to turn him out of house and

home " was calculated to operate strongly on her filial sensibilities. If she was afterwards fully of opinion that to do as her brother proposed would gratify her father, and that, in fact, the proposition had originated with him, no conclusions could have been more natural. There appears in this case, too, a patent element of misrepresentation or concealment. The hostility of William Simonds to his sister's marriage, and the exulting reflection, afterwards, upon his own agency in preventing the property from going with her, furnish indications of a strong motive operating with him to bring about the joint conveyance, which he was careful to omit from the inducements urged upon his sister.

Another apparent point of difference lies between the declared motive of gratitude in the one case, and that of justice or common honesty in the other. But whatever might be the comparative weight of these several motives, when manifestly spontaneous, we do not perceive that either is entitled to special consideration if it be the mere product of cultivation by an interested party. An undue influence will be none the less vicious because the finer feelings of our nature are made the instruments of design. We quote again from the opinion in the Ranken case : " Had such a deed been prompted by motives of affection, it would not be clear that a court of equity would allow it to stand. In the case of *Garvin* v. *Williams*, 44 Mo. 476 ; 50 Mo. 211, the testator was a young man in the last stages of consumption, without father or mother, brothers or sisters. Gratitude to his guardian and his wife prompted the will. The testator had no prospect of being able to enjoy the property, and he preferred that it should go to his guardian, who had been kind to him, instead of to distant relatives, where the law would carry it. Yet this court, upon general principles established in regard to transactions between guardian and ward, set the will aside. * * * It (Miss Patton's conveyance) was, to say the least, improvident and unnecessary, had any feeling of gratitude prompted it. The plaintiff was

just entering life, and might reasonably look forward to marriage and a family, and this loss of $60,000 might materially affect her future condition."

Just such a treatment of the subject is appropriate here. The plaintiff was hardly competent to weigh against her brother's appeal to her sense of gratitude, and her father's evident repugnance to being "turned out of house and home," the importance to her own well-being of preserving some basis, however meagre, for a future support, to say nothing of the duty to her intended husband, of bringing what she might into the common stock. So far as any real foundation for gratitude was concerned, there does not seem to have been more than is universal in the relations of children to their parents. It might possibly be considered less, if any thing, from the fact that the defendant had, in the discharge of his ordinary parental duty, drawn material aid from the estates of his children. No prevailing views of filial obligation, nor yet of prudent beginnings in life, are supposed to recommend that a daughter, on coming of age, shall surrender her whole inheritance as a compensation to her father for having done only what, by natural and social law, he was bound to do without recompense.

We conclude that the conveyance in question was, as to the plaintiff Margaret, not a spontaneous act; that it arose from the suggestions of others; that it was pressed upon her as a moral obligation; that this pressure came directly from the brother, whose advice she had been accustomed to follow; and indirectly, though perhaps more effectively, from her father, who had expressed his fear of her exercising her rights of property; that if gratitude prompted the act, it was a gratitude dictated by another, and obeyed as a direction rather than followed as an impulse of the affections; that no intelligent judgment sanctioned, or could possibly have sanctioned, a proceeding so grossly improvident in a young girl just entering life, and about to take

upon herself the responsibilities of a family; that the advice given her was uncandid, in failing to submit to her scrutiny a controlling motive of her brother's, which motive may have been sufficiently powerful even to induce his own conveyance as the most effective means of influencing hers by the weight of his example; that, upon the evidence preserved in this record, the conveyance, so far as it affects the rights and interests of the plaintiff, Margaret J. Miller, should be set aside.

All the judges concurring, the judgment is reversed and the cause remanded.